**EDWARD E. GILLEN COMPANY,**
a Wisconsin corporation,
Plaintiff–Appellant,

v.

**CITY OF LAKE FOREST,**
Defendant–Appellee.

No. 92–2206.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1992.

Decided Aug. 17, 1993.

John A. Busch (argued), Lee J. Geronime, Grant C. Killoran, Michael, Best & Friedrich, Milwaukee, WI, William E. Snyder, Michael, Best & Friedrich, Chicago, IL, for plaintiff-appellant.

David M. Stahl (argued), Bruce Zessar, Sidley & Austin, Chicago, IL, for defendant-appellee.

Before KANNE and ROVNER, Circuit Judges, and REYNOLDS, Senior District Judge.*

ILANA DIAMOND ROVNER, Circuit Judge.

Edward E. Gillen Company ("Gillen") brought this diversity suit against the City of Lake Forest, Illinois ("Lake Forest") after Lake Forest refused to pay for unanticipated expenses Gillen had incurred in constructing off-shore breakwaters for a municipal marina. Claiming damages in excess of $850,000, Gillen sought recovery under theories of express and implied warranty, mistake, equita-

---

\* The Honorable John W. Reynolds, Senior District Judge for the Eastern District of Wisconsin, sitting by designation.

ble reformation, negligent misrepresentation, quantum meruit, contract, and quasi-contract. The district court dismissed several of these claims, including the claim for equitable reformation of Gillen's contract with Lake Forest. The court later granted Lake Forest's motion for partial summary judgment as to damages, holding that most of the monetary relief Gillen sought was precluded by the contract's "no damages for delay" clause. Gillen challenges both of these rulings on appeal. We affirm.

## I. FACTS

In 1986, Gillen was awarded a contract to construct off-shore breakwaters in Lake Michigan for the Lake Forest marina. A portion of the project involved the construction of "Breakwater II," which was designed to serve as both a breakwater and a walkway for strolling and fishing. The dual purpose of this breakwater required that it be built of large stones that fit closely together. Accordingly, the manual setting forth Lake Forest's specifications for the project (and that served as the basis for Gillen's bid) dictated the use of cubic "AIII" stone with a uniform dimension of approximately 4.5 feet. The project manual also required that this stone be procured solely from Valders Stone and Marble, Inc. ("Valders").

After Lake Forest awarded the construction contract to Gillen, it contracted with Valders to supply the AIII stone. An addendum to Lake Forest's agreement with Valders required that the stone conform to the requirements of the project manual. Valders supplied the first shipment of AIII stone in September 1986. Although the stone was inspected and approved by a Lake Forest agent, it did not meet the project manual's specifications, particularly in terms of its dimensions and shape. Gillen complained to Lake Forest's site engineer, but the engineer instructed Gillen to select the better pieces of stone and try to "jigsaw" them together. Gillen incurred additional costs in doing so.

A second shipment of stone was delivered in October 1986, and it had the same problems as the first. Lake Forest again directed Gillen to jigsaw the stone into place. However, when Gillen was approximately halfway through installing this shipment, Lake Forest's engineer agreed that the stone was inadequate and halted construction. Shortly thereafter, Lake Forest issued Change Order No. 5, which altered the specifications for the breakwater, shortening the portion to be constructed of AIII stone and dictating a different type of construction for the remainder. The change order also extended the completion date for Breakwater II from January 1, 1987 to May 22, 1987. Gillen proceeded in accordance with the new specifications until mid-December 1986, when construction was halted for the winter.

In January 1987, Gillen submitted a claim to Lake Forest for the additional costs it had incurred as a result of the non-conforming AIII stone. Lake Forest denied the claim.

On March 27, 1987, Lake Forest issued Change Order No. 6, which required Gillen to reconstruct a 75–foot portion of the breakwater, replacing the AIII stone with pre-cast concrete units. Gillen refused to sign the order because it did not provide for any additional compensation. But when Lake Forest threatened to replace Gillen and sue for damages, Gillen proceeded as ordered. Gillen completed work on Breakwater II in May 1987. Gillen filed this action in January 1991.[1]

The district court dismissed Gillen's equitable reformation claim because Gillen had not alleged that its written contract with Lake Forest departed from the parties' mutual understanding of their agreement. In the court's view, Gillen's allegation that it had entered into the contract expecting that Valders would supply appropriate stone supported a claim for breach of warranty or contract (which Gillen had asserted separately), but not one for equitable reformation.

1. In 1989, Gillen sued Lake Forest in Illinois state court seeking to recover its additional costs. After the circuit court dismissed one of Gillen's claims and granted judgment on the pleadings as to another, Gillen voluntarily dismissed its remaining claims without prejudice and appealed the circuit court's rulings. The Illinois appellate court affirmed on October 23, 1991. Certain of the claims Gillen asserted in its federal complaint overlapped with the claims disposed of by the state court. These were dismissed below on res judicata grounds and are not at issue here.

*Edward E. Gillen Co. v. City of Lake Forest,* No. 91 C 0183, 1991 WL 171945, at *5–6, 1991 U.S.Dist. LEXIS 12274, at *14–15 (N.D.Ill. Sept. 3, 1991).

The court subsequently granted Lake Forest's motion for partial summary judgment as to damages, concluding that most of the damages Gillen sought were barred by Supplemental Condition SC–12.5 of the contract, which provided:

> The CONTRACTOR agrees that in the event of delay for any reason caused by any party or person, it will be fully compensated for the delay by an extension of time to complete the Contract and will not seek additional compensation.

*Edward E. Gillen Co. v. City of Lake Forest,* No. 91 C 0183, 1992 WL 29995, 1992 U.S.Dist. LEXIS 1438 (N.D.Ill. Feb. 12, 1992). Gillen filed a motion to reconsider, arguing that a substantial portion of its damages resulted from additional costs that were unrelated to delay. The district court denied the motion, observing that Gillen had never before quarreled with the proposition that the majority of its damages were delay-related. The court further concluded that despite Gillen's belated attempt to re-characterize its damages, most of the costs for which it sought compensation had in fact been caused by delay. *Edward E. Gillen Co. v. City of Lake Forest,* No. 91 C 0183, Minute Order (N.D.Ill. Apr. 22, 1992).

The district court's ruling barred Gillen from recovering all but $82,000 of the damages it sought.[2] The parties subsequently settled that portion of the suit.

## II. ANALYSIS

On appeal, Gillen contends that the district court erred in finding that the majority of its alleged damages were delay damages barred by its contract with Lake Forest. Gillen also contends that its complaint stated a viable claim for equitable reformation of the contract that should not have been dismissed.

**2.** This amount represented the balance of the payments due under Gillen's contract with Lake Forest, including $2,000 for timber, $50,000 for pre-cast concrete stairs, and a $30,000 "retainage" that the city still held. None of these were

## A. The Nature of Gillen's Damages Claims

■ Illinois courts have consistently honored contractual provisions that preclude the recovery of damages resulting from delay. *Bates & Rogers Constr. Corp. v. Greeley & Hansen,* 109 Ill.2d 225, 93 Ill.Dec. 369, 372, 486 N.E.2d 902, 905 (1985).[3] Gillen does not dispute that SC–12.5 of its contract with Lake Forest bars delay damages, nor does it challenge the validity of the clause under Illinois law. It takes issue solely with the district court's finding that the bulk of its damages were, in fact, delay damages. We review this decision de novo, viewing the record in the light most favorable to Gillen and determining whether it reveals any material dispute of fact that precludes summary judgment. *Colburn v. Trustees of Indiana Univ.,* 973 F.2d 581, 585 (7th Cir.1992).

■ In granting partial summary judgment as to the damages Gillen claimed, the district court observed that "[n]o party disputes that these damages are 'delay damages.'" 1992 WL 29995, at *3, 1992 U.S.Dist. LEXIS 1438, at *7. Gillen contests that finding. It concedes that the word "delay" appears in its complaint, in the deposition testimony of its witnesses, and in its damages study. Gillen Br. at 9. Gillen nonetheless maintains that the district court ignored indications in the record that its damages were not entirely caused by delay. Gillen emphasizes that many of the costs for which it seeks compensation resulted from additional work occasioned by the faulty stone rather than from delay in completion of the breakwater. Gillen points to this response to Lake Forest's statement of facts:

> While the calculations set forth ... in Gillen's Damages Study ... describe Gillen's damages as "delay" damages, *Gillen's Complaint seeks damages from Lake Forest for a wide range of damages* caused by Lake Forest's failure to supply conforming stone to the project and the work done under Change Order No. 6.

additional or unexpected costs caused by construction difficulties.

**3.** The parties agree that Illinois law governs.

R. 51 at 10–11 ¶ 20 (emphasis supplied) (citation omitted). Gillen also notes the deposition testimony of its president, Gary A. Jackson:

> This isn't a delay [case]. This is a breach. I mean they furnished defective stone. This is a breach of contract.

R. 60 at 62. In Gillen's view, these statements were enough to put the district court on notice that Gillen disagreed with the "delay" label Lake Forest had affixed to its damages.

We understand Gillen to make two separate but related arguments: (1) that it did not concede that its damages were delay damages, as the district court indicated; and (2) that the evidence before the court established a factual dispute as to the nature of Gillen's damages, thus precluding summary judgment on the issue. We find neither argument to be correct. Although we might be inclined to agree that not all of Gillen's additional costs were actually caused by delay, *see Paul Hardeman, Inc. v. United States*, 406 F.2d 1357, 1361, 186 Ct.Cl. 743 (1969), our review of the record convinces us that Gillen neglected to make this contention in a timely manner below and did not, in any event, identify evidence sufficient to establish a dispute of fact as to this issue.

Lake Forest's view of Gillen's damages was clear from the start. In the city's motion for summary judgment, this view figured prominently as a reason why Gillen's potential recovery should be limited to $82,000:

> A second, independent reason why Gillen's damages are so limited is that the contract between Lake Forest and Gillen contains a "No damages for Delay" clause (Supplementary Condition SC–12.5), which bars Gillen from seeking delay damages (including damages for cost overruns, additional overhead, and lost profit) in this case. It is clear from Gillen's Complaint and the damages analysis submitted by Gillen's damages expert that all items of damages alleged, beyond the $82,000 described above, are alleged to have resulted from job-related delays.

R. 37 at 3 ¶ 2. Lake Forest's supporting memorandum repeated this argument, supplementing it with a relatively lengthy discussion of *Bates & Rogers Constr. Corp., supra*, which construed a comparable "no damages for delay" clause. R. 38 at 14–16. Indeed, from the first page on, the memorandum consistently referred to Gillen's effort to recover impermissible "delay damages."

Yet, Gillen's responsive memorandum did not so much as hint that its claims were unrelated to delay. Instead, Gillen attempted to skirt SC–12.5 entirely, arguing that (1) the clause should be construed narrowly and should yield to the equitable defenses of waiver and estoppel, (2) the delay caused by the non-conforming stone was not contemplated by the parties when they entered into the contract, (3) Lake Forest had interfered with Gillen's performance, and (4) Lake Forest had breached the contract. R. 49 at 16–22.[4] Indeed, in several instances, Gillen itself described the damages it was seeking as delay damages. For example, the heading for the second argument listed above read:

> SC–12.5 Does not bar Gillen's Claims Because *Delay* Caused by Non-conforming AIII Stone was not Contemplated by Gillen and Lake Forest When They Signed the Contract.

R. 49 at 17 (emphasis added). As support for this argument, Gillen relied in part on a New Jersey case holding—in Gillen's words—that "[a] contractor was entitled to *delay damages* despite the [no-damages-for-delay] clause." *Id.* at 18 (emphasis added) (citing *Franklin Contracting Co. v. State*, 144 N.J.Super. 402, 365 A.2d 952 (App.Div.1976)). Gillen also asserted that "Lake Forest's failure to supply conforming AIII stone to Gillen precludes the application of SC–12.5 to bar *Gillen's claims for delay damages*" and that "[a] jury must decide whether SC–12.5 was intended to cover a situation where Lake Forest, by its own interference, caused *Gillen's delay*." R. 49 at 20, 22 (emphasis added).

Against this backdrop, the district court was correct in concluding that Gillen had conceded that its damages were delay dam-

---

4. Gillen did refer occasionally to "extra work" (*e.g.,* R. 49 at 7, 8, 9), but it did not suggest that this phrase was meant to distinguish additional costs unrelated to delay.

ages. Gillen was not simply silent on the subject; rather, its own arguments against application of SC–12.5 proceeded from the premise that its damages did result from delay. Had Gillen believed the premise faulty, surely this would have been the first argument it made in opposition to Lake Forest's efforts to invoke the "no damages for delay" clause. Having forsaken the opportunity to articulate that argument in its memorandum, Gillen waived it; the district court was under no obligation to construct the argument on Gillen's behalf. *See Burdett v. Miller,* 957 F.2d 1375, 1380 (7th Cir.1992).

Granted, Gillen did seem to contest the notion that it was seeking delay damages in the factual statement it submitted in opposition to the motion for summary judgment. In addition to noting that its complaint sought compensation "for a wide range of damages caused by Lake Forest's failure to supply conforming stone" (R. 51 at 10–11 ¶ 20), Gillen stated:

> Gillen objects to Lake Forest's characterization of Gillen's damage study as being "composed of, for the most part," damages for delay. Gillen's damage study discusses and analyzes extra construction costs incurred by Gillen due to Lake Forest's failure to provide conforming AIII stone to Gillen.

*Id.* at 5 ¶ 36 (citation omitted). The supporting affidavit of Gary Jackson similarly suggested that some of the items for which Gillen sought recovery were unrelated to delay, including the cost of "rebuilding Breakwater II and other additional work." R. 50 at 7 ¶ 24. A close inspection of the factual statements might therefore have revealed that the parties did not fully agree on the proper label for Gillen's damages.

Yet, whatever Gillen's factual statement may have suggested about the nature of its damages, it made no effort to identify particular costs that did not belong under the rubric of delay damages. For example, when Gillen first objected to Lake Forest's characterization of its damages claims, Gillen merely noted that its damages study "analyze[d] extra construction costs" incurred by the company. R. 51 at 5, ¶ 36. Gillen did not list any of these "extra" costs, nor did it cite any portion of the damages study that did so. Having reviewed the study ourselves, we found no illumination as to which of Gillen's additional costs were time-sensitive and which were not.[5] Instead, the study itself frequently uses the term "delay," (R. 75, Ex. 10, 11), and Gillen candidly admitted as much in its factual statement (R. 51 at 10–11, ¶ 20). In an evident attempt to circumvent this problem, Gillen went on to assert that its *complaint* sought recovery for a variety of damages, citing Jackson's affidavit as support for this assertion. *Id.* Again, Gillen did not cite the relevant portions of the complaint, nor did it identify which of the allegations referred to damages unrelated to delay. Jackson, in turn, cited the reconstruction of Breakwater II and "other additional work" as examples of items which were not delay damages, but he too merely referenced the complaint generally as support for this position. R. 50 at 7 ¶ 24.

We have previously held that a party seeking to avoid summary judgment may not establish a dispute of material fact with unsubstantiated assertions in its factual summary or in affidavits. *E.g., Valenti v. Qualex, Inc.,* 970 F.2d 363, 368–69 (7th Cir.1992); *Duffey v. Central States, Southeast & Southwest Areas Pension Fund,* 829 F.2d 627, 630 (7th Cir.1987). Here, the gist of Lake Forest's summary judgment motion was that *all* of Gillen's damages (save $82,000) were precluded by SC–12.5. Lake Forest found support for that position in Gillen's own damages study. Thus, it was not enough for Gillen simply to suggest that "not all" of its damages were delay damages without attempting to identify and quantify which damages were not. Mere citations to its complaint also would not suffice. *McDonnell v. Cournia,* 990 F.2d 963, 967 (7th Cir.1993); *Deutsch v. Burlington N. R.R. Co.,* 983 F.2d 741, 743–44 (7th Cir.1993), *cert. denied,* — U.S. —, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). In

---

5. Only after losing the motion for summary judgment did Gillen submit a revised damages analysis that, unlike the earlier versions, identified which components of its damage claims were time-sensitive and which were not. R. 79.

order to establish a factual dispute as to the cause of its damages, Gillen was obliged to identify evidence supporting its conclusory assertion that some of its damages were unrelated to delay. Gillen did not meet this obligation.[6]

The district court's summary judgment ruling was therefore correct. Even if Gillen's outright concessions that its additional costs were delay damages are ignored, the record is nevertheless devoid of evidence to support the passing assertions in Gillen's factual statement that at least some of its damages were unrelated to delay.

## B. Equitable Reformation Claim

■ Gillen sought equitable reformation of its contract with Lake Forest to allow compensation for the additional costs it had incurred in constructing the breakwater. The district court found the claim defective because rather than alleging that the written contract mistakenly departed from the parties' actual agreement, the complaint alleged only that the stone provided to Gillen did not conform with the contract specifications. In the district court's view, this was a claim for breach of contract or warranty, not equitable reformation. 1991 WL 171945, at *5–6, 1991 U.S.Dist. LEXIS 12274, at *14–15. We review the district court's decision de novo, accepting the allegations of the complaint as true and drawing all reasonable inferences in Gillen's favor. *Crane v. Logli,* 992 F.2d 136, 138 (7th Cir.1993), *petition for cert. filed* (July 19, 1993) (93–5350).

In support of its claim for equitable reformation, Gillen alleged that: (1) Lake Forest knew that Gillen's bid was based on the reasonable belief that Valders would supply AIII stone that complied with the project specifications; (2) Lake Forest knew that Valders could not, in fact, supply appropriate stone; (3) Lake Forest failed to advise Gillen of this fact; and (4) Gillen was therefore misled. Based on these allegations, Gillen sought equitable reformation of the contract to compensate it for the cost of removing the nonconforming stone and replacing it with

pre-cast concrete units. R. 1, Count IV ¶¶ 47–50.

The district court relied on *Friedman v. Development Management Group, Inc.,* 82 Ill.App.3d 949, 38 Ill.Dec. 379, 381, 403 N.E.2d 610, 612 (1st Dist.1980), for the proposition that a departure from the parties' actual agreement is required in order to reform their written contract:

> The basis of an action to reform a contract is that the parties had reached an agreement but, in reducing it to writing, some provision agreed upon was omitted or one that was not agreed upon was inserted, either through mutual mistake or through mistake on the part of one party and fraud on the part of the other. Reformation will change the contract so that it properly reflects the agreement originally reached by the parties. (*Harley v. Magnolia Petroleum Co.* (1941), 378 Ill. 19, 37 N.E.2d 760.) For reformation to be available as a remedy, both the mistake and an actual agreement other than that expressed in the writing must be shown.

*See also Michigan Ave. Nat'l Bank of Chicago v. Evans, Inc.,* 176 Ill.App.3d 1047, 126 Ill.Dec. 245, 251, 531 N.E.2d 872, 878 (1st Dist.1988); *Beynon Bldg. Corp. v. National Guardian Life Ins. Co.,* 118 Ill.App.3d 754, 74 Ill.Dec. 216, 220, 455 N.E.2d 246, 250 (2d Dist.1983); *Sheldon v. Colonial Carbon Co.,* 116 Ill.App.3d 797, 72 Ill.Dec. 289, 291–92, 452 N.E.2d 542, 544–45 (1st Dist.1983).

We agree that Gillen did not allege a discrepancy between the written contract and the parties' actual understanding. Gillen did not identify any term or omission in the contract that was inconsistent with the parties' intended agreement. To the contrary, the project manual on which Gillen based its bid contained the same provision that is at the core of this contractual dispute—the requirement that Breakwater II be constructed of AIII stone supplied by Valders. The crux of Gillen's claim is rather that Gillen assumed Valders would supply conforming stone and calculated its bid accordingly and that Lake

---

6. Because we affirm the grant of summary judgment on the ground articulated by the district court, we need not reach the alternative arguments Lake Forest has offered in support of the judgment.

Forest accepted Gillen's bid with actual or constructive knowledge that this assumption was mistaken.

Gillen seems to concede that there was no discrepancy of the kind described in *Friedman*, but it calls our attention to a series of federal contract cases holding that reformation is appropriate when a party submits a bid incorporating a mistake and the government accepts the bid in silence knowing of the mistake. *See Ruggiero v. United States*, 420 F.2d 709, 713, 190 Ct.Cl. 327 (1970); *see also C & L Constr. Co. v. United States*, 6 Cl.Ct. 791, 800 (1984), *aff'd mem.*, 790 F.2d 93 (Fed.Cir.1986); *BCM Corp. v. United States*, 2 Cl.Ct. 602, 606 (1983). In *Ruggiero*, the Claims Court articulated the following rationale for this rule:

> [W]hat we are really concerned with is the overreaching of a contractor by a contracting officer when the latter has knowledge, actual or imputed as something he ought to know, that the bid is based on or embodies a disastrous mistake, and accepts the bid in the face of that knowledge.

420 F.2d at 713. Illinois reformation cases also seem to support relief in this situation, to the extent that the erroneous bid could be construed as a unilateral mistake "which is known and concealed by the other party." *Michigan Ave. Nat'l Bank*, 126 Ill.Dec. at 251, 531 N.E.2d at 878; *see also Lukas v. Lightfoot*, 131 Ill.App.3d 566, 86 Ill.Dec. 825, 826–827, 476 N.E.2d 1, 2–3 (5th Dist.1985); *Sheldon v. Colonial Carbon Co., supra*, 72 Ill.Dec. at 292, 452 N.E.2d at 545.

Although Gillen's complaint does suggest that Lake Forest knew of Gillen's mistaken assumption and kept mum, the nature of the mistake does not support equitable reformation. The very authorities on which Gillen

relies emphasize that the error must be arithmetical, clerical, or a misreading of the contract specifications, as opposed to a mistake in judgment. *Ruggiero*, 420 F.2d at 713; *see also C & L Constr. Co.*, 6 Cl.Ct. at 801 n. 2; *BCM Corp.*, 2 Cl.Ct. at 610; *Aydin Corp. v. United States*, 669 F.2d 681, 685, 229 Ct.Cl. 309 (1982). Gillen's mistaken assumption that Valders would be able to supply conforming stone was not this kind of scrivener's error. It cannot therefore be redressed through equitable reformation of the contract, even assuming that Lake Forest was aware of the mistake.[7]

■ As the district court recognized, Gillen's claim is at bottom one for breach of warranty. Any "mistake" that Gillen may have made in assuming that Valders could supply adequate AIII stone is really irrelevant, in view of the fact that Gillen had no say in the selection of Valders. The real source of Gillen's injury was Lake Forest's requirement that it use stone supplied by Valders, and redress for that injury lies in a claim for breach of Lake Forest's implicit warranty that this stone would be adequate. As Justice Brandeis explained in *United States v. Spearin*, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918):

> Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered.... But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications.

(Citations omitted.)[8] *See Al Johnson Constr. Co. v. United States*, 854 F.2d 467,

---

7. Lake Forest argues that "it is preposterous to believe that Lake Forest 'knew' and hid from Gillen that Valders could not supply conforming stone," because "Gillen was constructing the breakwaters *for Lake Forest* [and] [i]t would have been irrational for Lake Forest to choose a stone supplier that it knew could not do the job." Lake Forest Br. at 39 n. 26. At the pleading stage, however, we are required to accept the truth of Gillen's allegations; and although it may indeed seem illogical for a municipality to contract with a supplier it knows cannot meet contractual specifications, the scenario is hardly so

far-fetched that we may simply reject outright Gillen's allegation that it happened here.

8. The plaintiff in *Spearin* had contracted with the government to build a dry dock at the Brooklyn Navy Yard. The contract required the plaintiff to divert and relocate a sewer at the site of the dry dock and the plaintiff did so. However, a subsequent downpour caused the sewer to break and flood the construction site. Investigation revealed that a dam in a connecting sewer (of which the parties had been unaware) had caused the failure of the relocated sewer. When the

468 (Fed.Cir.1988) ("[t]he *Spearin* doctrine is much alive today"); *see also Trustees of Indiana Univ. v. Aetna Cas. & Sur. Co.*, 920 F.2d 429, 436 (7th Cir.1990); *USA Petroleum Corp. v. United States*, 821 F.2d 622, 624 (Fed.Cir.1987); *Ordnance Research, Inc. v. United States*, 609 F.2d 462, 479, 221 Ct.Cl. 641 (1979) (per curiam). Illinois courts have embraced the breach of warranty theory articulated in *Spearin. See W.H. Lyman Constr. Co. v. Village of Gurnee*, 84 Ill. App.3d 28, 38 Ill.Dec. 721, 726–29, 403 N.E.2d 1325, 1330–33 (2d Dist.1980).

Gillen's extensive reliance on *In re J–I–J Constr. Co.*, 84–3 BCA ¶ 17,619, 1984 WL 13702 (Eng.BCA Sept. 13, 1984), confirms that its claim is in reality one for breach of warranty. Like this case, *J–I–J* involved construction of a breakwater. The project specifications required the contractor to use particular grades of stone and to obtain the stone from a certain quarry. The designated quarry did not produce adequate amounts of the stone, however, which delayed completion of the work and increased the contractor's costs. The contractor sought additional compensation, and the Corps of Engineers Board of Contract Appeals agreed that it was entitled to "equitable adjustment" of the contract price:

> The specification entitled "Government Designated Quarry" specifically described the type of rock to be found at the Joslin Property and indicated that Appellant should obtain the armor rock from that site. By designing a breakwater and associated facilities which required armor rock

of certain types and sizes for this project, and including this type of specification, the Government conveyed a belief to Appellant that the designated sources were adequate. In view of the record in this case, it is apparent that the information contained in the specification was in error.

> In accordance with the accepted weight of authority flowing from *Spearin v. United States*, 248 U.S. 132 [39 S.Ct. 59, 63 L.Ed. 166] (1918), the contractor has a right to rely on a definitive representation in the specifications and is entitled to recover the added costs incurred as a result of the erroneous or inadequate information.

> In the totality of the circumstances, we conclude that it was reasonable for Appellant to assume that the designated quarry was capable of producing sufficient armor rock for the project and rely[ ] on this representation in bidding the contract.

84–3 BCA ¶ 17,619 at 87,804 (some citations omitted). Although Gillen seizes on *J–I–J*'s reference to "equitable adjustment" of the contract, *J–I–J*'s rationale, as well as its citation to *Spearin*, leave no doubt that the underlying theory is breach of warranty.

As the district court pointed out, Gillen had asserted breach of warranty claims elsewhere in its complaint. Count II in particular echoed the very rationale of *Spearin* and *J–I–J* when it alleged that "Lake Forest impliedly warranted, by naming Valders as the sole and mandatory source of AIII stone in its project manual, that Valders would

---

plaintiff refused to make the necessary repairs without additional compensation, the government annulled the contract. Applying the rule set out above, the Supreme Court agreed that the plaintiff was entitled to damages:

> In the case at bar, the sewer, as well as the other structures, was to be built in accordance with the plans and specifications furnished by the government. The construction of the sewer constituted as much an integral part of the contract as did the construction of any part of the dry dock proper. It was as necessary as any other work in the preparation for the foundation.... The risk of the existing [sewer] system proving adequate might have rested upon Spearin, if the contract for the dry dock had not contained the provision for relocation of the 6–foot sewer. But the insertion of the articles prescribing the character, dimensions

and location of the sewer imported a warranty that if the specifications were complied with, the sewer would be adequate....

> ... The breach of [that] warranty, followed by the government's repudiation of all responsibility for the past and for making working conditions safe in the future, justified Spearin in refusing to resume the work. He was not obliged to restore the sewer and to proceed, at his peril, with the construction of the dry dock. When the government refused to assume the responsibility, he might have terminated the contract himself; but he did not. When the government annulled the contract without justification, it became liable for all damages resulting from its breach.

248 U.S. at 137–38, 39 S.Ct. at 61–62 (citations omitted).

200

produce the stone in the quantity and quality necessary to satisfactorily and timely complete the construction of Breakwater II." R. 1, Count II ¶ 40. Indeed, Gillen successfully relied on this line of authority below in opposing Lake Forest's motion to dismiss Count II. *See* R. 16 at 10–14.

The district court's dismissal of the equitable reformation claim was therefore correct. The only viable theory supporting relief in this respect was breach of warranty, and Gillen had alleged that claim separately.

### III. CONCLUSION

Because Gillen virtually conceded below that the vast majority of the damages it claimed were delay damages, and in any event failed to identify which of its damages were not delay-related, the district court was correct in finding that the bulk of Gillen's damages claims were barred by its contract with Lake Forest. The district court also properly dismissed Gillen's claim for equitable reformation of the contract.

AFFIRMED.